UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN DOUGLAS WHITE,

Petitioner,

v.

WILLIAM KNIPP,

Respondent.

No. 2:11-cv-3016 TLN DAD P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a second degree murder conviction entered against him on March 3, 2008, in the Sacramento County Superior Court. He claims that his statements to police should have been excluded from evidence at his trial because they were obtained in violation of the decision in Miranda v. Arizona, 384 U.S. 436 (1966), and that his right to due process was violated by the evidentiary rulings of the trial court, jury instruction error, the cumulative effect of errors at his trial, and the trial court's refusal to order the release of juror identifying information. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for federal habeas corpus relief be denied.

/////

/////

BACKGROUND

In its unpublished memorandum and opinion[1] affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> In these separate appeals consolidated for oral argument and disposition, defendant Carlos Tomas Campaz, Jr., (Campaz) appeals following his conviction for first degree murder of Jerimi Millican (the victim), and defendant John Douglas White (White) appeals following his conviction in a second trial for second degree murder of the same victim. (Pen. Code, § 187; undesignated statutory references are to the Penal Code.) Campaz contends the jury instructions impermissibly allowed a conviction on a "misdemeanor-murder" theory that he aided and abetted a simple assault that resulted in murder. White, who was convicted in a second trial after his separate jury in the first trial deadlocked, claims evidentiary and instructional error and contends the trial court erred in denying his request for jurors' identifying information.
>
> We shall affirm the judgments as to both Campaz and White.
>
> **PROCEDURAL BACKGROUND**
>
> Campaz, White, and Robert Moreno Montoya (who did not appeal) were charged with murder, with allegations of personal use of a knife and lying in wait. A joint trial was held with three juries. Theories of culpability included aiding/abetting first or second degree murder and aiding/abetting a target crime of simple assault, assault with a deadly weapon, or assault likely to cause great bodily injury, where murder was the natural and probable consequence.
>
> Montoya's jury found Montoya not guilty of first degree murder but guilty of second degree murder and found he personally used a knife.
>
> Campaz's jury found Campaz guilty of first degree murder but found not true the allegations of personal use of a knife and lying in wait. The court denied a motion for new trial and sentenced Campaz to an indeterminate term of 25 years to life.
>
> White's jury deadlocked, and the court declared a mistrial. In the retrial, the prosecution dropped the "natural and probable consequence" theory; Montoya testified as a prosecution witness; and the jury found White not guilty of first degree murder but guilty of second degree murder, with a finding that he did not personally use a knife. The trial court denied a defense petition for access to juror identifying information and sentenced White to a term of 15 years to life.

[1] ECF No. 17-1 (hereinafter Opinion).

Different evidence was adduced in the two trials, and we set forth the evidence separately for each defendant.

**I. Campaz's Appeal**

**A. Facts**

Evidence adduced at the trial in which Campaz was convicted included the following:

On August 5, 2004, around 8:00 a.m., park maintenance workers discovered the victim's body in a restroom at Gardenland Park near Northgate Boulevard in Sacramento. The cause of death was multiple stab wounds; the time of death was estimated at 5:00 a.m.

Marie Ceragioli, who was friendly with Campaz and performed home improvement work at White's house, testified that a few days after the killing, she was at a restaurant with Campaz when he admitted his participation. Campaz said, "Doug [White] got me twenty-five to life. I think I'm in some serious trouble, and I'm like what's going on."

Ceragioli testified at trial that Campaz told her the following: White planned to beat the victim "badly" for raping White's sister when White had been too young to do anything about it, and Campaz went to "back him up" to stop anyone from interfering.[2] Campaz and White waited at the park. Montoya brought the victim there on the pretext of a drug buy. They went into the park bathroom, where White started screaming and "just going crazy," "whaling on [the victim] . . . in a rage" with two knives, one of which had spikes. Campaz was in shock; he did not expect this and had no idea White had a knife. The victim tried to run out of the bathroom, but Campaz panicked and pushed the victim back in. (Although there was some evidence that Campaz, in recounting the incident to Ceragioli, displayed a stabbing gesture rather than a pushing gesture, the jury found Campaz did not personally use a knife.) The victim fell, and White continued the attack. Campaz told White to stop because the victim was dying. In later conversations with Ceragioli, Campaz changed details, e.g., he said Montoya also stabbed the victim and the planned beating was over drug debts rather than rape. At some point, Campaz and White told Ceragioli they took money and drugs from the victim to make it look like a drug transaction. White threw the weapons in the river. They tried but failed to burn their escape vehicle - a stolen truck in White's possession. (The police found White's blood and the victim's blood in the truck.)

Ceragioli called the crime "tip line," believing she could stay anonymous, but a police detective contacted her. She told the

[2] Aiding/abetting liability may be predicated on being present to serve as a lookout or to give warning of anyone seeking to interfere. (People v. Swanson–Birabent (2003) 114 Cal.App.4th 733, 743–744.)

detective on August 20, 2004, that Campaz said the plan was to murder the victim. At the preliminary hearing, Ceragioli said Campaz thought the plan was to beat the victim, not murder him. At trial, Ceragioli said Campaz said the plan was to beat the victim badly enough to hospitalize him.

At trial, Ceragioli was asked about her preliminary hearing testimony, where she said the plan according to Campaz was to "beat" the victim, but she did not say "badly." She testified at trial that the amount of information was overwhelming, and "you guys were very vague at prelim." She said Campaz said the plan was to beat the victim "badly" and "put him in the hospital."

At trial, Ceragioli acknowledged she used methamphetamine during some of the conversations with Campaz and White. She was asked about her preliminary hearing testimony, where at one point she invoked the Fifth Amendment to a question about her own drug use but at another point answered "no" to a question, "have you in fact used methamphetamine yourself." At trial, she said she interpreted this latter question as referring to the specific time of the murder.

Ceragioli did construction work at White's house even after learning of the killing. White said he stepped over the victim to "take a piss," and White bragged about getting an uninvolved acquaintance, Anthony Martinez, to confess on audiotape. Ceragioli testified she felt it was her duty to keep returning to the home of someone she believed to be a killer, because she used to work in the victim witness program in the San Diego District Attorney's office.

Campaz always carried a distinctive Protech pocket knife given to him by Ceragioli. After the killing, he gave it to her, and she turned it over to the police. It had a small pinkish stain, which did not test positive as blood but was more likely rust.

Campaz eventually agreed to turn himself in to the police, and Ceragioli made the call.

In cross-examination of Ceragioli, the Campaz defense elicited that Ceragioli was angry with her ex-lover, Geri Quintana, for supporting Campaz, and left threatening phone messages. Ceragioli received a $500 reward from the police but also had to relocate due to threats she received warning her not to testify against White. Ceragioli admitted prior hospitalizations for mental health problems.

Martinez testified he and others consumed drugs at White's house the night of the killing. Martinez saw the victim leave the house with Montoya; Campaz and White left with them or a few minutes later. Martinez was awakened when the three later returned without the victim. Campaz appeared nervous and scared. White left briefly, and Campaz and Montoya argued over who killed the victim. White returned and said he killed the victim for raping White's sister, and he was going to kill Martinez so he could not snitch. White told Campaz to stab Martinez, but Campaz said no,

Martinez was like a brother to him.   White held a machete to Martinez's throat and forced him to say, "I killed Jerimi" into a tape recorder.

Michael Gardner testified he was sleeping at White's house the night in question, was awakened and saw White, Campaz and Montoya on the roof, and later overheard a conversation between Campaz and Montoya, in which Gardner believes he heard Montoya say something to the effect "did we hurt him?" or "did we kill him?"   After a couple of seconds or minutes, Campaz said something like "keep quiet" or "don't tell [White]."

Timothy Chacon testified White phoned him around 6:00 a.m. on August 5, 2004, needing a ride.   White was upset and crying.   He said, "I" and "we" "fucked up."   Chacon drove to the levee.   White got out of the car.   Chacon saw a splash in the water.   Days later, White was on drugs and said he killed someone who owed money for methamphetamine, but Chacon did not believe him.

In the first trial (wherein Campaz and Montoya were convicted but White's jury deadlocked), White testified in his own defense, in front of all three juries.   White denied any animosity toward the victim at the time of the killing.   White was previously upset with the victim for failing to return a truck and money borrowed from White.   The victim later returned the truck and money, and everything was fine between them.   White's sister was raped years earlier, but not by the victim, and White denied accusing the victim of rape.

On August 4, 2004, White spent much of the day consuming marijuana and methamphetamine with Campaz, who arrived already "wired."   They continued the party that night with Montoya, the victim, and others.   They consumed alcohol and smoked marijuana and methamphetamine.   The victim and Montoya borrowed from White a blue pickup truck (stolen by someone else) and went to the park to buy drugs from Montoya's cousin.  Later, White and Campaz went to the park in a friend's red pickup truck.   They found Montoya and the victim sitting on a bench.   White went into the park bathroom to urinate and then joined the others outside.   Because it was windy, Montoya, Campaz, and the victim went into the bathroom to smoke some methamphetamine.   White stayed outside and smoked marijuana.   Campaz came out, saying, "Let's get the fuck out of here."   Montoya then came out with a blank look on his face.   White looked into the bathroom and saw the victim face down on the ground.

White, Campaz, and Montoya drove in White's truck to the red pickup, but they saw a police car and kept going.   Campaz said, "Man we fucked up.   We fucked up."   They drove to White's house, but the other party people were still there, sleeping, so White had Campaz and Montoya get up on the roof and remove their bloody clothes.   White testified he was afraid of Campaz from having been threatened by him several weeks earlier, when White

saw Campaz stab a friend, Fernando Perez, for allegedly stealing a Play Station.

By now, it was daylight. White called a friend, Tim Chacon, for help. Chacon drove White to the river, where White threw two knives, a wallet, a key ring and a cell phone off a bridge. White wrapped the bloody clothes in a blanket and set fire to it. White testified he told Chacon, "I fucked up" but did not say he hurt anyone.

The next day, White briefly "whal[ed] on" Anthony Martinez over a suspected theft. White said it was Campaz who ordered Martinez to say into a tape recorder operated by White, "I, Anthony Martinez, killed Jerimi Millican at Gardenland Park." White said Ceragioli told him he better not snitch on Campaz. White testified he was afraid of Campaz because White thought Campaz was a member of the Norteño street gang. White admitted to being a Norteño associate while in jail during the trial.

White admitted he lied in his statement to the police.

Tomas Wayne testified he loaned his red pickup truck to his friend, Campaz. Several days after the killing, Wayne discovered his truck near the park and called the Crime Alert tip line. Wayne reported that Montoya said he was being blamed for the killing but all he did was drop the victim off at the park. Wayne previously saw White showing off a knife with spikes.

Campaz did not testify but put on a defense case that included testimony of Dr. John Wicks, an expert in clinical psychology, in an attempt to impeach Ceragioli. Dr. Wicks reviewed Ceragioli's mental health records, which revealed a diagnosis of borderline personality disorder with features consistent with methamphetamine abuse.

Dr. Wicks testified that persons with severe personality disorders tend to have amorphous memories and distort information, particularly when stressed. Threatening phone messages left by Ceragioli are consistent with an ongoing personality disorder. Methamphetamine abuse can also cause brain damage affecting memory function, exacerbating the problems related to the personality disorder.

As indicated, Campaz's jury found Campaz guilty of first degree murder but found "Not True" the two allegations of Campaz (1) lying in wait and (2) personally using a deadly and dangerous weapon, to wit, a knife. Montoya's jury found Montoya guilty of second degree murder, with personal use of a knife. White's jury deadlocked, and the court declared a mistrial.

**II. White's Appeal**

White's appeal raises claims of evidentiary and instructional error and the trial court's refusal to release juror identifying information. We shall affirm the judgment.

**A. Facts**

Evidence adduced at White's retrial included the same forensic evidence, but Ceragioli testified as a defense rather than prosecution witness, and Montoya testified as a prosecution witness.

Montoya acknowledged his second degree murder conviction and his expectation that if he testified the prosecutor would put in a good word for him for parole purposes. Montoya denied seeking revenge against White for testifying in the first trial. Montoya attributed his own conviction to his own recorded confession to police. Montoya testified he spent the three weeks before the August 2004 killing celebrating his 18th birthday with Ecstasy, methamphetamine, and alcohol. He met White by buying marijuana from him in June; he met Campaz at White's house in July. On the afternoon before the killing, Montoya, White, Campaz, and Martinez, all of whom had been awake for days, smoked methamphetamine at White's home. The victim arrived, smoked some of his own methamphetamine, and left. White later said the victim "had to go" for raping White's sister; they had to kill the victim. Campaz said nothing. Montoya protested until White said he could not risk Montoya "snitchin'." White appeared "amped up" on methamphetamine and was hyperactive, angry, and bossy. White brainstormed various scenarios but settled on luring the victim to the park on the pretext that someone wanted to buy drugs from the victim. White displayed two knives - one with spiked handles and the other in a sheath. After consuming more drugs, Montoya and the victim left in White's blue pickup truck. At the park, they met up with White and Campaz and, while ostensibly waiting for the drug buyer, went into the park restroom to smoke methamphetamine. White struck the victim in the face with the spiked knife, then got the victim in a headlock and stabbed him in the chest. Campaz punched the victim in the stomach. The victim was crying and trying to escape. White pushed the victim into Montoya, who stabbed the victim in the stomach with the sheath knife. The victim fell to the ground. White repeatedly pushed Montoya to "finish him off." Montoya feared he would be killed if he refused, so he stabbed the victim two more times in the back. Montoya and Campaz left with White but returned at White's direction to grab the victim's possessions. The three left in the blue pickup, stopped to let Campaz out at the red pickup, but all continued on in the blue vehicle because they saw a police car. They returned to White's house, went on the roof and removed their bloody clothes. Later, White told Montoya and Campaz to burn the blue pickup; they tried but failed. They told Anthony Martinez what happened. White was furious about the disclosure, held a machete to Martinez's throat, and made him confess to the murder on a tape recorder. After the killing, Montoya learned the victim never raped White's sister.

Montoya, Campaz, and White were active Norteño gang members in jail. While in jail, Norteño gang members "jumped" Montoya for being a snitch. Before the first trial, the prosecution rejected Montoya's offer to plead guilty to first degree murder with a

sentence of 25 years to life and to testify.  He was then convicted of second degree murder and sentenced to 16 years to life.  The prosecutor persuaded Montoya that testifying in the retrial was the right thing to do.  Montoya decided not to appeal his own conviction because he thought he "got off easy."

The jury saw a videotaped police interview of White, in which White admitted he urinated in the park restroom just before the killing but denied killing the victim and refused to implicate anyone.  White admitted being angry with the victim over use of White's vehicle and failure to pay money owed to White for drugs.  White said the victim did not know White's sister.

White testified at the retrial, blamed Campaz and Montoya for the killing, and said all he (White) did was dispose of the weapons.  White admitted he went to the park but said he believed they went for a drug transaction.  White smoked marijuana outside, while the others went in the restroom to smoke methamphetamine.  Montoya emerged from the restroom "stone faced," and Campaz fled saying they needed to leave immediately.  Curious, White looked inside and saw the victim lying on the ground.  The three left in a panic and removed their bloody clothes on White's roof.  White, with help from Chacon, threw the knives into the river and used charcoal fluid to burn the clothes.  White said it was Campaz who forced Martinez to audiotape a confession.  White denied using a machete on Martinez.  White said he lied in the police interview because he did not want to be labeled a snitch.  White said he was stabbed several times in jail for testifying in the first trial and so, for his own protection, he associated with the Norteño gang in jail.  He had never been a gang member but was useful to the gang because he could write legible "kites" (tiny notes used in jail to transmit messages).

Chacon testified White said, "I" and "we" "fucked up" concerning somebody who raped a girl and owed him money.  Chacon and White drove to a river, and White threw something into the river.  Days later, White said, "I" or "we" killed someone.  Chacon admitted he initially denied any knowledge when speaking with the police.

In the retrial, Ceragioli was called as a witness by the defense rather than the prosecution.  She said Campaz at one point said he stabbed the victim.  She also related, however, that Campaz said White stabbed the victim.  She said Campaz said Montoya stayed in the truck.  She also said Campaz said White forced Montoya to stab the victim, but this evidence was admitted for the limited purpose of evaluating whether statements Campaz made to Ceragioli at the restaurant were believable.

Dr. Wicks testified the effects of methamphetamine include anger, paranoia, misperception, and memory loss.

/////

/////

> As indicated, the jury found White guilty of second degree murder but found he did not personally use a knife.
>
> Additional facts appear in our discussion.

(Opinion at 2-11, 53-57.)

After petitioner's judgment of conviction was affirmed by the California Court of Appeal, he filed a petition for review in the California Supreme Court. (Resp't's Lod. Doc. 10.) The Supreme Court summarily denied that petition by order dated August 11, 2010. (Id.)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "'[c]learly established federal law' consists of holdings of the Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and

whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. Petitioner's Claims

A. Evidentiary Rulings

In his claim for relief based on evidentiary rulings he believes were in error, petitioner challenges four specific evidentiary rulings by the trial court. The court will evaluate each of those rulings in turn below.

1. Admission of Gang Evidence

In his first ground for federal habeas relief, petitioner claims that the trial court violated his right to due process in admitting evidence of his post-offense gang affiliation in jail and his conduct while in jail. (ECF No. 1 (Pet.) at 50.) Petitioner argues that the admission of this evidence "created a substantial risk that [petitioner] was convicted on the basis of bad character and other irrelevant and inflammatory misconduct, rather than the evidence of the charged offenses . . . ." (Id. at 51.) Petitioner also argues that the amount of such gang evidence admitted at his trial was "excessive in a material way" and that the trial court "failed to scrutinize the evidence as regards its scope and unfair detail." (Id.) He argues, "the excessive, unnecessary, and unfair post-offense gang evidence painting [petitioner] as a shot caller or gang leader played heavily into the second jury's conclusion he at least aided and abetted the others, even if his physical involvement and motive remained quite unclear." (Id. at 60.)

Petitioner explains that he was forced to associate with a prison gang in order to protect himself while in jail, and he argues that "trying [petitioner] based on post-offense survival conduct in jail in an admissions/credibility case involving a clouded killing like this was quite unfair." (Id.) Although the trial court gave a limiting instruction with respect to evidence of petitioner's post-conviction conduct, petitioner argues the limiting instruction did "not realistically mitigate the prejudice either." (Id.) Petitioner argues that, on balance, the admission of this evidence rendered his trial fundamentally unfair. (Id. at 53-55, 56.)

/////

/////

The California Court of Appeal rejected these arguments, reasoning as follows:

> White argues the trial court erred in admitting evidence of his post-offense gang affiliation and jail conduct, on the issue of credibility, denying him due process and a fair trial. We see no basis for reversal.
>
> **a. Background**
>
> In the first trial, evidence of White's post-offense gang affiliation in jail came in during cross-examination to impeach White's testimony that he was afraid of Campaz due to Campaz being a gang member and therefore did not report Campaz to the police.
>
> Before White's retrial, the trial court considered competing motions in limine about admissibility of this evidence. White argued it was unfair to smear him with post-offense jail associations assertedly forced on him in jail, based on a straw-man gang impeachment, because fear of being a snitch was more than enough of an explanation why White did not go to the police, regardless of any gang association by Campaz. The court initially stated it might exclude the evidence if White did not mention fear of Campaz's gang in the retrial. The court later decided, however, that if White testified in the second trial, the prosecution was entitled to show White was impeached in the first trial, regardless of whether he brought up Campaz's gang.
>
> In the retrial, White testified he was afraid of his codefendants, was attacked in jail for being a snitch, and had no choice but to associate with the gang in jail for protection. He was not one of the gang's leaders, despite writing his name second on a list of gang members. He was more of a secretary, used by the gang because he could write very small, a useful talent for passing messages in jail. Prosecution evidence showed that White and his cellmate, a gang member, fought with jailers while trying to flush gang papers during a cell search. The jury was instructed the gang evidence could not be used to prove White was a bad person but only for the limited purpose of evaluating whether he testified truthfully and as it related to the officer's opinions.
>
> **b. Analysis**
>
> The People acknowledge that White's trial court objection - that the evidence was unduly prejudicial - allows him to argue for the first time on appeal that the overruling of his objection had the legal consequence of violating the constitutional right to due process. (<u>People v. Partida</u> (2005) 37 Cal.4th 428, 431.)
>
> White cites the familiar rule calling for caution in admission of gang evidence due to its inflammatory potential. (<u>People v. Champion</u> (1995) 9 Cal.4th 879, 922.) However, such evidence is admissible if it bears substantial probative value on a disputed issue. (<u>Ibid.</u>) We review the trial court's decision for abuse of discretion. (Evid. Code, § 352; <u>People v. Cole</u> (2004) 33 Cal .4th 1158, 1195.) The trial court was not asked to decide the due

> process issue. To establish a federal due process violation, the defendant must show there were no permissible inferences the jury could have drawn from the evidence. (People v. Steele (2002) 27 Cal.4th 1230, 1246; People v. Albarran (2007) 149 Cal.App.4th 214, 229–230.)
>
> Here, the evidence bore substantial probative value to impeach White because he testified under oath in the first trial that he was afraid of Campaz due to Campaz being a gang member. White's argument, that he had no need in the first trial to mention the gang to explain his fear of "snitching," is immaterial. The fact is that he did mention it, opening the door to impeachment with his own gang conduct. White argues this impeachment evidence was a contrived "strawman" because he was forced to associate with the gang in jail as a survival tactic. However, this is his claim; it is not a fact - unless the jury finds it to be true, in which case he was not unduly harmed by the evidence.
>
> White argues the scope of the gang evidence was excessive. However, his entire factual analysis is, "the scope of evidence (kites, misconduct, and opinions on shot-caller status along with unsupported insinuations of prior neighborhood/Varrio association) admitted again at the retrial was excessive in a material way." We disregard this point as inadequately briefed without factual development. (People v. Turner (1994) 8 Cal.4th 137, 214, fn. 19.) There was no evidentiary error or due process violation in admitting the gang evidence.

(Opinion at 63-66.)

A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Id. See also Greel v. Martel, No. 10-16847, 472 Fed.Appx. 503, 504, 2012 WL 907215, *1 (9th Cir. Mar. 19, 2012) ("There is likewise no clearly established federal law that admitting prejudicial evidence violates due process.").[4]

In light of these authorities, the state court's rejection of petitioner's argument that the trial court violated his right to due process in allowing the admission of unduly prejudicial evidence of his conduct in jail and his involvement with prison gangs does not support the granting of federal habeas relief under AEDPA. There is no "clearly established federal law" that the admission into evidence of a defendant's conduct while in jail, including his association with a prison gang, violates the due process clause.

In any event, the challenged evidence was not unreliable and it was relevant to evaluate the credibility of petitioner's testimony that he participated in the murder because he was afraid of Campaz. Moreover, the jury was given an appropriate instruction to the effect that the gang evidence could not be relied upon to prove that petitioner was a bad person. The court presumes that the jurors followed this instruction. Kansas v. Marsh, 548 U.S. 163, 179 (2006); Richardson v. Marsh, 481 U.S. 200, 206 (1987); Fields v. Brown, 503 F.3d 755, 782 (9th Cir. 2007). Under these circumstances, the admission of evidence with respect to petitioner's conduct while in jail awaiting trial was not so unduly prejudicial as to prevent a fair trial.

Petitioner has failed to demonstrate that the decision of the California Court of Appeal rejecting his argument that his due process rights were violated by the admission of such evidence was contrary to or an unreasonable application of federal law. Accordingly, he is not entitled to federal habeas relief with respect to this claim.

/////

/////

---

[4] Citation to this unpublished Ninth Circuit opinion issued after January 1, 2007 is appropriate pursuant to Ninth Circuit Rule 36-3(b).

2. Admission of Evidence of Duress

Petitioner claims that the trial court violated his right to due process in admitting evidence that Campaz, and possibly also Montoya, participated in the murder under duress after petitioner threatened them with violence. (Pet. at 85.) The California Court of Appeal described the background to this claim, and its ruling thereon, as follows.

> White contends the trial court erred in admitting unreliable reports of duress made by Campaz to Ceragioli which, even with a limiting instruction, assertedly denied White's rights to due process and a fair trial. We reject the contention.
>
> The defense wanted to adduce evidence that, during his restaurant conversation with Ceragioli, Campaz confessed to stabbing the victim, but the defense unsuccessfully tried to exclude other statements made in the same conversation, i.e., including that White used two knives. Later, the prosecution secured admission, for impeachment purposes, of a different conversation, in which Campaz said Montoya also stabbed the victim at White's urging, and White threatened to stab Montoya and Campaz if they did not stab the victim. The court instructed the jury this latter conversation could be used only to assess believability of the restaurant conversation.
>
> White argues this latter statement by Campaz about White threatening to stab him was erroneously admitted. White says it was not a declaration against Campaz's interest; it shifted blame to White and portrayed Campaz as acting under duress. White says it was unfair to admit this "unreliable evidence the defense had no chance to cross-examine."
>
> The People respond the evidence was admissible under Evidence Code section 1202: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." The purpose of this statute is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination. (People v. Corella (2004) 122 Cal.App.4th 461, 470.)
>
> The trial court has broad discretion in controlling the scope of cross-examination and in ruling on the admissibility of impeachment evidence. (People v. Lancaster (2007) 41 Cal.4th 50, 102.) White argues that, although the Confrontation Clause is inapplicable to nontestimonial hearsay (Davis v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224]), and assuming this holding applies to an offense predating it, admission of such "pivotal but grossly unreliable and untested evidence, from a man and woman probably already scheming to blame appellant and claim duress,"

> denied due process and a fair trial, requiring reversal under Chapman or Watson. We disagree.
>
> Thus, a court's proper application of rules of evidence does not ordinarily violate due process. (People v. Frye (1998) 18 Cal.4th 894, 945.) The appropriate question is whether admission of the evidence was so extremely unfair as to violate fundamental conceptions of justice. (Dowling v. United States (1990) 493 U.S. 342, 352 [107 L.Ed.2d 708, 720].)
>
> Here, it was fair to admit the challenged statement, since its admission assured fairness to the party against whom hearsay evidence was admitted without an opportunity for cross-examination. The defense specifically chose to introduce Campaz's statement against interest. It was fair and appropriate for the jury also to consider Campaz's later statement in evaluating whether his statements at the restaurant were believable.
>
> We conclude the evidence regarding duress affords no basis for reversal.

(Opinion at 72-74.)

The state court record reflects that at petitioner's retrial Marie Ceragioli testified for the defense that after the murder, during a conversation at a restaurant, Campaz made a "shanking" motion when Ceragioli asked him what he did to Millican. (Reporter's Transcript on Appeal (RT) at 7698-7705, 8120-21). After listening to a recording, Ceragioli agreed that she told police that Campaz actually stated he stabbed Millican a few times to keep Millican from leaving the restroom. (Id.) Ms. Caregioli also testified that Campaz told her during that same conversation at the restaurant that petitioner stabbed Millican with two knives. (Id.) She further testified that after the conversation at the restaurant, Campaz told her that petitioner yelled at Montoya to stab the victim, and also threatened to stab both Montoya and Campaz if they did not stab the victim, because he "didn't want to be found guilty and them snitching on him." (Id. at 8122, 8160.)

With regard to Ceragioli's testimony about Campaz's statements at the restaurant, petitioner's trial counsel asked the trial court to allow him to elicit only the testimony about Campaz's own participation in the murder, on the theory that those statements were "a declaration against penal interest by Mr. Campaz." (Id. at 6822, 8065.) Defense counsel argued that eliciting Campaz's further statements describing petitioner's involvement in the crime (i.e., that petitioner stabbed Millican with two knives) was improper because these statements were not against

Campaz's penal interests and would violate petitioner's rights under the Confrontation Clause. (Id. at 6824.) The trial court rejected defense counsel's arguments in this regard and ruled that if petitioner's counsel asked Ceragioli about what Campaz said about his own involvement in the stabbing, the prosecutor would be allowed to ask her about the rest of the conversation; in particular, Campaz's statement that petitioner stabbed Millican with two knives. (Id. at 6822-6826.) The trial court reasoned that petitioner could not waive his right to confrontation with respect to only a portion of the statement but assert that right with respect to other parts of the same statement. (Id. at 6825.) The trial court also opined that limiting Ceragioli's testimony to Campaz's statements about his own involvement in the murder would "mislead the jury into believing that was the only thing that happened in the bathroom." (Id. at 6822.)

With regard to Caregioli's testimony about the statements made by Campaz after the conversation at the restaurant, the trial court ruled that the prosecution could elicit those statements in order to point out inconsistencies between Campaz's various versions of what occurred during the murder. (Id. at 8064-66.) The jury was, however, given a limiting instruction with respect to all of this evidence, which informed the jury as follows:

> Marie Ceragioli has testified to statements Carlos Campaz made to her while they were at the Five Two Four restaurant. If you decide that Carlos Campaz made those statements, the law allows to you [sic] consider the statements as proof that the information contained in them is true. Marie Ceragioli has also testified to statements Carlos Campaz made to her at a time after their conversation at the Five Two Four Restaurant. If you decide that Carlos Campaz made those statements, the law allows you to consider them in a limited way. You may only consider them in evaluating whether the statements he made to Marie Ceragioli at the Five Two Four Restaurant are believable. You may not consider these other statements as proof that the information contained in them is true, nor may you use them for any other reason.

(Id. at 8557; see also id.at 8067.)

In his habeas petition before this court, petitioner argues that "admitting the latter statement about threats to stab codefendants was error even with a limiting instruction." (Pet. at 86.) He contends that this statement was "not part of the conversation at the restaurant the defense sought to admit;" it was not a declaration against Campaz's interest because it only implicated petitioner in the stabbing; and it was so prejudicial as to render his trial fundamentally

unfair. (Id. at 86-87.) Petitioner argues that the statement did not serve to explain or impeach Campaz's various statements about what occurred, but only added "an especially unreliable 'early' excuse for why things happened – duress – that was not amenable to a limiting instruction." (Id.) Petitioner also argues that the evidence was "grossly unreliable" because it came from "a man and woman probably already scheming to blame [petitioner] and claim duress." (Id. at 87.)

Petitioner contends that these latter statements relayed by Caregioli to which he objected constituted the only direct evidence of threats or coercion by petitioner "beyond a few dubious claims from Montoya." (Id. at 88.) He notes that the jurors were instructed that "compelling another person to commit a crime by threats or menace supported accomplice liability." (Id.)[5] Finally, petitioner contends that the limiting instruction given by the trial court to the jury was not effective because "courts recognize key inculpatory statements from accused codefendants are often not fairly amenable to limiting instruction in most cases." (Id. at 88.)

As in the case of the claim discussed immediately above, the state court's decision rejecting this argument advanced by petitioner was not contrary to clearly established federal law. Holley, 568 F.3d at 1101. Moreover, even if it were, the admission of the challenged evidence did not render petitioner's trial fundamentally unfair. Evidence of petitioner's threats to Campaz and Montoya was admitted for the limited purpose of evaluating Campaz's previous statements to Ceragioli about what transpired during the stabbing. This was a "permissible inference the jury may draw from the evidence." Jammal, 926 F.2d at 920. Further, the jury was given an appropriate limiting instruction. As noted above, the court must presume that the jurors followed the limiting instruction. Richardson, 481 U.S. at 206; Fields, 503 F.3d at 782. Finally, the challenged evidence was not "entirely unreliable" and the jury was "competent to uncover, recognize, and take due account of its shortcomings." Mancuso, 292 F.3d at 956.

/////

5 Specifically, the jury was instructed that "If the defendant forced another person to commit a crime by threatening, menacing, commanding, or coercing that person, then the defendant is guilty of the crime that the defendant forced the other person to commit." (Clerk's Transcript on Appeal (CT) at 1571.)

To the extent petitioner is arguing that admission of the challenged statements violated the Confrontation Clause, his claim should also be rejected. In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. Crawford v. Washington, 541 U.S. 36, 68 (2004). This rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements. Id. at 42, 51, 68. See also Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.") The statements made in this case by Campaz to Ceragioli were not testimonial. See Doan v. Carter, 548 F.3d 449, 458 (6th Cir. 2008) (victim's statements to friends and neighbors not testimonial); United States v. Manfre, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements made by declarant to family members were not "testimonial" because they were "not the kind of memorialized, judicial-process-created evidence of which Crawford speaks"); Gonzales v. Clark, No. CV 08-02251-AG (VBK), 2009 WL 3233906, *8 (C.D. Cal. Sept. 30, 2009) (petitioner's private statements to his aunt were not testimonial in nature). Accordingly, the Confrontation Clause has no application here.

Petitioner may also be attempting to argue that the trial court violated the California Evidence Code in admitting into evidence Campaz's remarks to Ceragioli. Even if the trial court did erroneously apply the California Evidence Code, the decision of the California Court of Appeal rejecting this state law claim is binding on this court and may not be challenged in this federal habeas corpus proceeding. Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Rivera v. Illinois, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a denial of due process") (quoting Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982) and Estelle v. McGuire, 502 U.S. 62, 67, 72-73 (1991)); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in federal habeas"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does

not lie for errors of state law); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief.").

For the reasons set forth above, petitioner is not entitled to federal habeas relief with respect to his challenge to the admission into evidence of Campaz's statements to Caragioli about the threats made by petitioner.

3. Exclusion of Evidence of Third Party Culpability

Petitioner claims that the trial court violated his right to due process when it excluded evidence from admission at trial that Campaz had committed two recent knife assaults. (Pet. at 65-73.)

The California Court of Appeal described the background to this claim, and its ruling thereon, as follows:

> White maintains the trial court erred in precluding him from using evidence of Campaz's two other knife assaults as evidence of third party culpability, denying White due process, a fair trial, and the right to present a defense. We disagree.
>
> **a. Background**
>
> White sought to admit evidence that (1) on June 25, 2004 (before the August 5, 2004, killing at issue here), Campaz assaulted Fernando Perez with a knife over a stolen Play Station, with Marie Ceragioli urging him on (which she denied at the preliminary hearing); and (2) on July 28, 2004, Campaz assaulted Tomas Wayne with a knife for taking methamphetamine that Wayne wanted to sell but Campaz wanted to consume.
>
> White argued the Perez incident showed Ceragioli's bias in favor of Campaz and Campaz's character, and the Wayne incident showed the long term relationship between White and Wayne and was admissible character evidence under Evidence Code section 1101, subdivision (b). White later argued the evidence was relevant as third party culpability evidence.
>
> Although the evidence came in for other purposes, the trial court rejected the third party culpability theory because the two prior incidents did not tend to show Campaz committed the current offense. It would just show a propensity for violence, which was not an admissible purpose. The court understood the defense believed the evidence was relevant to attack Ceragioli's credibility but considered that use confusing and likely to result in the jury using it as character evidence.

> The court instructed the jury: "The testimony of the defendant [White] regarding prior conduct of Carlos Campaz, including the stabbing of Fernando Perez and the incident with [Tomas] Wayne, if you believe that evidence, may not be considered by you to prove that Mr. Campaz is a person of bad character or that he has a disposition to commit crimes or that he committed the crime alleged in this case. You may consider such evidence for the limited purpose of evaluating the defendant's state of mind and his actions. You may also consider the conduct as it relates to Dr. Wicks' opinion."
>
> **b. Analysis**
>
> To be admissible as evidence of third party culpability, the evidence must be capable of raising a reasonable doubt about the defendant's guilt. (People v. Hall (1986) 41 Cal.3d 826, 833.)
>
> Here, evidence of Campaz's prior violence would not exculpate White, because the two were in cahoots. To the extent White thinks he would be less culpable if someone else wielded the knives, he already got that benefit by the jury finding not true the allegation that he personally used a knife.
>
> We conclude the exclusion of evidence of third party culpability affords no basis for reversal.

(Opinion at 66-69.)

The state court record reflects that the trial judge at petitioner's first trial admitted evidence of Campaz's recent knife attacks as relevant character evidence. (RT at 5776, 5840.) At petitioner's retrial, the judge explained that he believed his prior ruling in this regard was erroneous. (Id.) Accordingly, evidence of Campaz's knife attacks was admitted at the retrial only as evidence of petitioner's state of mind at the time of the killing, and only after petitioner testified that his actions were dictated by his fear of Campaz. Further, the jury at petitioner's retrial was given a limiting jury instruction to the effect that the evidence should not be considered as evidence that Campaz was a person of bad character or that he committed the crimes alleged in this case. (CT at 1555.) Petitioner argues that these rulings at his retrial precluded his trial counsel from presenting a defense of third party culpability; i.e. that Campaz was more likely to have committed the murder of Millican because he had recently committed similar acts against other victims. (Pet. at 66, 72-73.)

Petitioner claims the trial judge's limitation on the jury's consideration of this evidence at his retrial was "arbitrary" and "disproportionate." (Id.) He contends that the jury "sorely

deserved to hear" evidence of Campaz' recent knife assaults "to help understand who was really responsible for a clouded, senseless methamphetamine killing." (Id. at 67.) Petitioner also argues the evidence was consistent with other evidence at trial indicating Campaz was the "actual attacker." (Id. at 67-68.)

Finally, petitioner argues that the limiting instruction given to his jury at the retrial was unfair because it prevented him from presenting "significant probative" evidence in support of his defense that he was not the killer. (Id. at 69-71.) Petitioner acknowledges that evidence regarding the knife attacks was admitted for other purposes, but he argues that the "substantive relevance limitation, instructional limitation, and limitation on defense jury argument" nonetheless violated his federal constitutional rights. (Id. at 69.)

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" and the right to present relevant evidence in their own defense. Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). However, the United States Supreme Court has not "squarely addressed" whether a state court's exercise of discretion to exclude testimony violates a criminal defendant's right to present relevant evidence. Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009). Nor has it clearly established a "controlling legal standard" for evaluating discretionary decisions to exclude the type of evidence at issue here. Id. at 758. Accordingly, the decision of the California Court of Appeal that the trial court's decision to exclude evidence of Campaz's two recent knife assaults for the purpose of demonstrating third party culpability did not violate the federal constitution is not contrary to or an unreasonable application of clearly established federal law and may not be set aside. Id. See also Knowles v. Mirzayance, 556 U.S. 111, 112 (2009) ("it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the United States Supreme Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given no clear answer to the question presented, let alone one in [the petitioner's]

favor," because the state court cannot be said to have unreasonably applied clearly established federal law); Brown v. Horell, 644 F.3d 969, 983 (9th Cir.) ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions."), cert. denied ___ U.S. ___, 132 S. Ct. 593 (2011).

Moreover, this court agrees with the California Court of Appeal that the trial court's decision to preclude the admission of evidence of Campaz's recent knife assaults as evidence of third party culpability did not violate petitioner's right to due process. Evidence of potential third-party culpability must be admitted when, under the "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial. Thus, in Chambers v. Mississippi, 410 U.S. 284, 303 (1973), exclusion of evidence of a third party confession violated due process where the excluded evidence was highly corroborated and the testimony was crucial to the defense. In Lunbery v. Hornbeak, 605 F.3d 754, 760-61 (9th Cir. 2010), the exclusion of a statement by a third party that he had killed defendant's husband deprived defendant of the right to present a defense because the "excluded testimony . . . bore substantial guarantees of trustworthiness and was critical to [defendant's] defense." However, the Ninth Circuit has determined that where the proffered evidence of third party culpability simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded. People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).

Even if evidence of Campaz's knife attacks had been admitted at petitioner's retrial for all purposes it would not have absolved him of the charged crimes because he, Campaz, and Montoya all acted in concert to kill Millican. In light of this, evidence that Campaz might have stabbed the victim would have no significant bearing on whether petitioner was guilty of second degree murder – the offense for which he was convicted. Further, Campaz's prior knife assaults involved completely different circumstances and did not directly connect Campaz with the

stabbing in this case. "The exclusion of tangential evidence of something that may have happened at a different time and place does not constitute a due process violation." Walters v. McCormick, 122 F.3d 1172, 1177 (9th Cir. 1997 ).

Even assuming arguendo that the trial court's exclusion of evidence of Campaz's two recent knife assaults was constitutional error, the error could not have had a "substantial and injurious effect or influence in determining the jury's verdict" under the circumstances of this case. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). In light of the significant evidence of petitioner's involvement in the killing, the exclusion of evidence that Campaz had recently committed two unrelated assaults does not lessen confidence in the verdict.

For all of these reasons, petitioner is not entitled to federal habeas relief with respect to this due process claim.

4. Exclusion of Impeachment Evidence

Petitioner claims that the trial court also violated his right to due process in excluding evidence from his retrial that would have tended to impeach the testimony of Marie Ceragioli. (Pet. at 76.) He argues that the impeachment evidence sought to be introduced by the defense was "the modest minimum needed to show Ms. Ceragioli was not necessarily the independent, stable, or disinterested tipster acting out of conscience that she appeared to be" but was, rather, "a vindictive, unstable, and violent individual willing to lie in court, discourage witnesses, smear people, and get back at anyone she developed problems with." (Id. at 80.)

The California Court of Appeal explained the background to this argument advanced by petitioner and its ruling thereon, as follows:

> **4. Exclusion of Evidence to Impeach Ceragioli**
>
> White complains the trial court excluded evidence to impeach Ceragioli, in asserted denial of his rights to due process, a fair trial, and his Sixth Amendment right to confront witnesses.
>
> In the retrial, the prosecution did not call Ceragioli as a witness but adduced evidence that she called the tip line, later helped the police locate Campaz, and gave the police Campaz's Protech knife. The defense called her as a witness to impeach her, hoping to portray her as a vindictive, unstable person who turned on former friends such as Campaz, and was willing to lie in court and discourage others from telling the truth. The defense showed Ceragioli's initial

> affiliation with Campaz but decided not to elicit her psychiatric history; the defense merely had Dr. Wicks testify about the effect of drug use on memory and paranoid delusions.
>
> The defense sought to adduce evidence of four threatening phone calls Ceragioli made to her former lover, Geri Quintana, a year after the killing but during pendency of this case. In the first three phone messages, Ceragioli warned Quintana to stop trying to help Campaz, to stop "bad mouth[ing]" Ceragioli, and to keep Quintana's new lover away from Ceragioli "or I will body bag your bitch ass friend." The fourth call referred to putting three murderers away, taking revenge on the neighborhood, and smearing Wayne. The defense wanted the jury to hear that Ceragioli blatantly lied about the phone threats at the preliminary hearing until presented with a tape recording of the calls; that she admitted to a Mr. Montez that she lied at the preliminary hearing; that she tried to blame White; and that she had influence over witness Anthony Martinez.
>
> The trial court ruled admissible only the last call (though the defense ultimately opted not to use it). The court excluded the other three calls under Evidence Code section 352. The court observed it sat through this evidence in the first trial and found it confusing, unduly time consuming, and of minimal relevance. The court excluded the Montez evidence because it was beyond the scope of the defense's redirect examination, and the defense had failed to disclose the statement its investigator took from Montez.
>
> On appeal, White acknowledges the trial court has discretion to exclude impeachment evidence under Evidence Code section 352 (People v. Tidwell (2008) 163 Cal.App.4th 1447, 1457), but White argues this discretion must bow to his federal constitutional rights to a fair trial and to present all relevant evidence of significant probative value, and he should get the benefit of any doubt. White claims the constitutional implications of the alleged error require application of the Chapman prejudice standard of harmlessness beyond a reasonable doubt.
>
> White argues it was important to impeach Ceragioli because she reported admissions by White while she was working on his house. He argues prejudice is shown because the first jury deadlocked, and both juries rejected premeditation and weapon use. We disagree.
>
> On appeal, White fails to address his failure to disclose the Montez statement. The phone calls were of minimal relevance, because they would not exculpate White. Indeed, the absence of prejudice (under any standard) is shown by the defense's decision not to use the one phone call allowed by the trial court. White's appellate brief says, "The defense later opted not to play this tape, perhaps because it referred to three murderers."
>
> We conclude exclusion of impeachment evidence does not warrant reversal.

(Opinion at 69-71.)

The decision of the California Court of Appeal rejecting petitioner's argument that the trial court's ruling excluding the three telephone calls and the evidence regarding Mr. Montez violated his right to due process is not contrary to or an unreasonable application of clearly established federal law. First, as set forth above, the United States Supreme Court has not "squarely addressed" whether a state court's exercise of discretion to exclude testimony violates a criminal defendant's right to present relevant evidence. See Knowles, 556 U.S. at 112; Wright, 552 U.S. at 126; Brown, 644 F.3d at 983. In addition, for the reasons explained by the California Court of Appeal, the exclusion of this impeachment evidence would not have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

B. Defense Counsel's Request to Testify

Next, petitioner claims that the trial court violated his right to due process, to confront the witnesses against him, and to "effective conflict-free representation" when it made an "inadequate inquiry and response" after his trial counsel declared a conflict of interest, requested a mistrial, and asked that he be allowed to testify about a pre-trial conversation he had with Timothy Chacon. (Pet. at 90.)

The state court record reflects that during a hearing conducted pursuant to California Evidence Code § 402,[6] Mr. Chacon described a meeting between himself and petitioner's trial counsel that occurred prior to Chacon's first statement made to police. (RT at 6580-88.) Chacon testified, among other things, that petitioner's counsel called and asked him to come to his office; that he and counsel did not discuss "going down to the river" or "picking Mr. White up;" and that counsel gave him his business card and told him "not to talk to the police, that [counsel] will talk to them for me." (Id. at 6583-84.) At the conclusion of this § 402 hearing, the trial court ruled that Chacon could not be asked about this meeting between himself and petitioner's trial counsel when he testified at petitioner's trial. (Id. at 6590.) At trial, Chacon testified that petitioner told him he "fucked up" and that he had killed someone. (Opinion at 8.)

---

[6] California Evidence Code § 402 provides a "procedure for determining foundational and other preliminary facts."

In the middle of trial, petitioner's counsel informed the court that he "would like to declare a legal conflict." (RT at 6831.) Defense counsel explained that he wished to testify about his recollection of the conversation between himself and Mr. Chacon in his office because he believed the jury should hear his version of that conversation, and because it was his opinion that Chacon lied during the § 402 hearing about what took place during that meeting. (Id. at 6831.) Trial counsel particularly wanted to testify that Chacon told him during their meeting that petitioner did not say he hurt or killed anyone. (Id. at 6836, 7013-17.) This statement was inconsistent with Chacon's trial testimony as well as his statements to police that petitioner did tell Chacon he had killed someone. Petitioner's counsel explained to the trial court that the fact Chacon lied at the § 402 hearing was "relevant to the issue of whether or not he's capable of lying, and whether or not he lied when he testified (at trial)." (Id. at 7014; see also id. at 6838-39.) Petitioner's counsel described the conflict of interest as follows: "I cannot act as [petitioner's] attorney and as a witness." (Id. at 6838.) The trial court declined to rule on trial counsel's request to testify at that time. (Id.)

After hearing further argument on this issue following the close of the prosecution's case, the trial court denied defense counsel's request to testify. (Id. at 7022-7030.) The court mentioned that it had the option of "allowing the trial to go forward and having [petitioner's trial counsel] testify in front of this jury with another attorney representing Mr. White for the limited purpose of [counsel's] testimony." (Id. at 7029.) However, the court rejected that option as not "viable," and denied counsel's request in its entirety. (Id.)

Petitioner argues that his trial counsel "needed to testify" that during his meeting with Chacon, Chacon implicitly admitted that he helped petitioner "burn things" and asked if he needed his own attorney, in order to demonstrate why Chacon would be willing to testify falsely for the prosecution at petitioner's trial. (Pet. at 90, 95.) Petitioner also argues that his trial counsel "needed to testify" that Chacon told counsel during their meeting that petitioner did not say he killed anyone, and that Chacon "blatantly misrepresented" what happened at that meeting, in order to demonstrate that Chacon's trial testimony was unreliable. (Id. at 90.)

/////

Petitioner further argues that the trial court should have further explored the option of appointing substitute counsel for petitioner for the limited purpose of allowing his trial counsel to testify, instead of denying counsel's request to testify in its entirety. (Id. at 91-94.) Petitioner contends that, at a minimum, the trial court should have asked him whether he was willing to waive any potential conflict posed by his trial counsel being allowed to testify. (Id. at 94-95.) He argues, "counsel's conflict needlessly denied [petitioner] key evidence without even an inquiry with [petitioner] as to the remedy or his willingness to waive any added conflict it posed." (Id. at 95.)

The California Court of Appeal rejected petitioner's arguments in support of this claim, ruling as follows:

> **6. Defense Counsel's Request to Testify**
>
> White claims the trial court erred in denying his trial counsel's (1) request to testify about a conversation counsel had with Chacon, (2) motion to be relieved as counsel due to conflict, and (3) motion for mistrial - which White claims denied him due process, a fair trial, the right to present defense witnesses, and the right to effective conflict-free representation. We see no basis for reversal.
>
> **a. Background**
>
> White's trial counsel wanted to testify about a conversation he had in his office with Chacon before Chacon's first statement to the police. Counsel wanted to testify that Chacon (by nodding or adoptive admission) implicitly admitted he helped White burn items; Chacon wondered whether he needed a lawyer; and Chacon said White did not admit to a "killing" but only that he "fucked up." White also wanted to adduce impeachment evidence that, in a recent foundational hearing, Chacon misrepresented what was said.
>
> The trial court gave detailed reasons in denying the motions, as follows:
>
> White's counsel would testify that he asked Chacon if White said he "killed" somebody, and Chacon said no, which would be inconsistent with what Chacon told the police. White's counsel would also testify that he and Chacon had different accounts of their meeting, which the court viewed as a collateral issue.
>
> The court said the timing of the defense disclosure of a conflict and mistrial motion was "troubling at best." White's counsel's conversation with Chacon occurred three years earlier, and the court disbelieved the defense's claim that there was no conflict until Chacon testified at the Evidence Code section 402 hearing. White's denial of killing anyone became relevant as soon as Chacon told the

police the opposite, and certainly by the time Chacon testified at the preliminary hearing and in the first trial, yet Chacon was not cross-examined about his conversation with Masuda [petitioner's trial counsel], and the potential conflict in needing Masuda's testimony was known in 2006, when another possible witness to the conversation (his secretary) died.

The court did not agree that Chacon's silence, when counsel said Chacon helped burn the clothes, constituted an adoptive admission.

The trial court recognized White sought his counsel's testimony to show Chacon was a liar, but "Chacon has already done that for himself. [¶] . . . [¶] He testified that he gave a version to police during the first interview that wasn't accurate, [though he] refused to admit that by doing so, he had lied to officers. [¶] . . . [¶] During cross-examination, Mr. Chacon testified in front of this jury that he lied to law enforcement when he spoke with them. What better evidence is there that Timothy Chacon is a liar than Timothy Chacon essentially admitting that himself?" Accordingly, said the court, trial counsel's testimony would be cumulative, which lessened its probative value.

The trial court recognized it had the option of allowing trial counsel to testify, with another lawyer representing White for the limited purpose of trial counsel's testimony. However, the defense had not requested that option, and it would put trial counsel in the uncomfortable position of having to defend his own credibility, and it would put the jury in the uncomfortable position of having to judge the credibility of a lawyer's testimony and at the same time listen to him as an advocate.[7]

The trial court concluded, "in light of the fact that I think that [White's counsel]'s testimony is cumulative, and it lessens its probative value, when comparing it to the result of a mistrial in order to allow its admission, I find that the prejudicial effect of a mistrial at this stage in the trial outweighs the probative value of the proffered evidence, and I hereby deny the defense request to have [White's counsel] testify to such, and deny a motion to be relieved, or a motion for mistrial."

**b. Analysis**

A defendant is not precluded from calling his trial counsel as a witness at trial. (People v. Earp (1999) 20 Cal.4th 826, 879.) However, whether a trial attorney should be allowed to testify during the trial depends on "an evaluation of all pertinent factors, including the significance of the matters to which the attorney might testify, the weight the testimony might have in resolving such matters, and the availability of other witnesses or documentary evidence by which these matters may be independently established. [Citation.]" (People v. Dunkle (2005) 36 Cal.4th 861, 915,

[7] We reject the contention in White's reply brief that the trial court thus made a "preemptive" ruling against this option without affording White the opportunity to address it.

disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)

White cites cases about his right to conflict-free representation, and that conflict embraces all situations in which an attorney's efforts on behalf of a client are threatened by his responsibilities. (People v. Clark, (1993) 5 Cal.4th 950, 994.) White acknowledges he must demonstrate actual prejudice under the federal Constitution, but he invokes the more stringent California standard requiring reversal even for a potential conflict if the record supports informed speculation that the defendant's right to effective representation was prejudicially affected. (Id. at p. 995.) However, the informed speculation standard was abandoned as amorphous, in People v. Doolin, supra, 45 Cal.4th at p. 421.)

Even assuming for the sake of argument that this situation could be characterized as a conflict between attorney and client, there was no prejudice under any standard. White argues that excluding his lawyer's testimony impeaching Chacon worked a hardship on him. However, the trial court concluded the defense had already accomplished this impeachment in cross-examination of Chacon. White argues the jury needed to know that Chacon "all but admitted" helping burn the clothes. However, White offers no analysis on the law of adoptive admissions and fails to show any grounds for reversal in the trial court's conclusion that Chacon's silence did not constitute an adoptive admission.

White thinks the jurors needed to know that Chacon asked if he himself needed a lawyer. We disagree.

White argues the trial court failed to make adequate inquiry into the existence of a conflict between attorney and client, which would have compelled the court to grant the motion to be relieved as counsel. He cites People v. Jones (1991) 53 Cal.3d 1115, 1136–1137, for the proposition that the trial court must make an adequate inquiry and assure itself that the defendant voluntarily waives the conflict. However, he acknowledges that the failure to conduct such inquiry requires reversal only if the defendant demonstrates an actual conflict resulting in an adverse effect on counsel's performance. (Id. at p. 1137.) Yet, White fails to show an actual conflict resulting in an adverse effect on counsel's performance.

White argues that, to the extent his trial lawyer should have realized the conflict sooner, he rendered ineffective assistance of counsel. (Strickland v. Washington (1984) 466 U.S. 668.) However, he offers no analysis. He says, "Deficiency and prejudice are apparent for reasons stated above and below" in his 105-page brief. And he says, "if counsel were somehow expected to divine the full conflict earlier, reasonable counsel would have done so and the omission prejudiced appellant at a live retrial; substitute counsel could always come up to speed on the case, but the evidence was lost forever in this trial." This cursory statement is inadequate to demonstrate deficiency or prejudice.

/////

> We conclude White fails to show grounds for reversal relating to defense counsel's request to testify and be relieved as counsel and motion for mistrial.

(Opinion at 74-79.)

The trial court determined, in essence, that defense counsel's proposed testimony was unnecessary and cumulative because Chacon had already admitted to the jury that he lied to the police. This is a reasonable conclusion based on the facts of this case. Petitioner's trial counsel stated that he wanted to testify about the conversation he had with Chacon in order to point out that Chacon had lied during the § 402 hearing and was not telling the truth at trial. In other words, defense counsel wanted to impeach Chacon's trial testimony with evidence that he had lied in the past. However, the jury had already heard evidence that Chacon had lied to the police. As stated by the California Court of Appeal, "the defense had already accomplished this impeachment in cross-examination of Chacon." (Id. at 78.) Cumulative testimony by petitioner's trial counsel that Chacon had lied during the § 402 hearing about his conversation with counsel would not have added anything of substance to the evidence already before the jury regarding Chacon's untruthfulness.

With regard to whether Chacon asked petitioner's attorney if he should get his own counsel, or impliedly admitted helping petitioner burn evidence, the state appellate court's conclusion that these facts were insubstantial and/or unreliable was also based on a reasonable determination of the facts of this case. Viewing the trial record as a whole, any error by the trial court in excluding the proposed testimony by petitioner's trial counsel about his conversation with Chacon could not have had a substantial or injurious effect on the verdict in this case. Brecht, 507 U.S. at 623.

Nor has petitioner established that he is entitled to federal habeas relief because his trial counsel was operating under a conflict of interest. It is well established that the right to effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). See also Campbell v. Rice, 302 F.3d 892, 897 (9th Cir. 2002). However, in order to establish an ineffective assistance of counsel claim based on a conflict of interest, a petitioner must show that an actual conflict of interest

adversely affected his lawyer's performance. Mickens v. Taylor, 535 U.S. 162, 174 (2002); Cuyler v. Sullivan, 446 U.S. 335, 348-350 (1980); Lewis v. Mayle, 391 F.3d 989, 997 (9th Cir. 2004); Mannhalt v Reed, 847 F.2d 576, 582 (9th Cir. 1988) (adverse effects found where a conflict "may have impacted the manner of the cross-examination" by the attorney).

Here, there was no conflict of interest that could have affected trial counsel's performance because the trial court declined to allow petitioner's trial counsel to testify at trial. In other words, the trial court's ruling prevented any potential conflict from arising. Assuming that the trial judge denied trial counsel's request to testify in order to avoid a conflict of interest from arising, petitioner has failed to demonstrate that the trial court's ruling violated any federal constitutional right. Finally, even if these events somehow gave rise to a conflict on the part of his counsel, petitioner has failed to demonstrate, or even to allege, that any such conflict affected his trial attorney's performance. That failure defeats any claim of ineffective assistance of counsel based on an alleged conflict of interest. The undersigned also notes that the trial court devoted considerable time to defense counsel's request to testify at petitioner's trial. The court explored possible solutions and allowed the prosecutor and petitioner's trial counsel to fully argue their respective positions. There is no evidence in the record that the trial court failed to "adequately respond" to any potential conflict on the part of defense counsel or to the arguments of petitioner's trial counsel on this issue.

Petitioner has also failed to demonstrate that his trial counsel rendered ineffective assistance in failing to recognize any potential conflict of interest or to make his request to testify at trial sooner. To succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. See also Richter, 131 S. Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable." ) There is no evidence in the record before this court that the judge presiding at petitioner's trial would

/////

have reached a different conclusion if petitioner's trial counsel had raised his desire to testify earlier in the trial.

For the reasons set forth above, the decision of the California Court of Appeal rejecting petitioner's arguments regarding his counsel's request to testify at trial was not contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to federal habeas relief with respect to that claim.

C. Miranda Violation

In petitioner's next ground for relief, he claims that his federal constitutional rights were violated by the admission into evidence at trial of his statements to police. (Pet. at 98.) He contends that the trial court should have excluded all of his statements after he invoked his right to counsel. (Id.)

The California Court of Appeal rejected petitioner's argument on this point, reasoning as follows:

> 1. Suppression Motion
>
> White contends the trial court erred in denying his motion to suppress statements he made to the police after invoking his right to counsel, in alleged violation of Miranda v. Arizona (1966) 384 U.S. 436. We see no grounds for reversal.
>
> a. Background
>
> The police arrested White and informed him of his Miranda rights. He agreed to talk. We have viewed the relevant portions of the DVD-recorded interview.
>
> The victim wanted to go to the park to sell narcotics. White gave him a ride and may have urinated in the park restroom just before the murder but denied any knowledge about the killing. White and the victim previously had a "falling out" over the victim owing White money for drugs and disappearing with White's truck. White said he once beat Anthony Martinez for stealing, but when the police asked whether the reason was that Anthony was "telling on somebody," the following ensued:
>
> "DETECTIVE: About Jeremy [the victim] being - getting killed?
>
> "MR. WHITE: About Jeremy fucking whatever. He went and fucking, ah, more or less fucking, he fucking - I told him to fucking, ah – ah - ah, I want to talk to my lawyer.
>
> "DETECTIVE: Okay.

"MR. WHITE: If that's the case then (unintelligible).[8]

"DETECTIVE: Well, you sit here until I process the paperwork and - and you go to jail and, ah, -

"MR. WHITE: My Lawyer, excuse me, I can't talk to my lawyer right now?

"DETECTIVE: No.

"MR. WHITE: 'Cause this is ridiculous, man. I mean, come on, man, I mean -

"DETECTIVE: I ge- you have to tell me you want to talk to me. Once you tell me -

"MR. WHITE: Nah. I just – it's not -

"DETECTIVE: - you tell me you want to talk to your lawyer, you talk – that's your right. And I got to – I - I respect that. But if you turn around and tell me you want to talk to me, then I'll talk to you but it's got to be your choice."

White then interrogated the detective, asking if he (White) was allowed to see the file, whether anyone else had been arrested, how many had been arrested, and whether any of the others had made any admissions. White asked, "if I had a recording — someone confessing to that murder, then what?" The detective said it would depend on a lot of things, but he could not explore them at that time, because White had asked for a lawyer. White kept talking, and the detective kept reminding him he had asked for a lawyer, which was fine, and the request for counsel precluded further conversation unless White said he wanted to talk. White said, "Will you talk to me about it a little bit, man, please?" The detective said yes. White said he was not involved with the killing and was being set up. He again acknowledged the urine was his. He said, "(Unintelligible) off, I knew I was da - like, man, I even fucking told one - ah, one of the homeboys that, ah, man, I'm cool, man. Jeremy [the victim] can't be at my house. I mean, we got a funk whatever. Fucking cool. I'll beat him up when I fucking see him. Or - or you know what I mean? But, ah, my boys was like, well, just give him a pass. Fucking (unintelligible). But, man, I was just like I'm cool. You know what I mean? (Whispering.) That's fucked up. Where was I just at?" White then said he felt "hella weird" and "fucked up" from drugs.

White sought suppression of what he said after requesting a lawyer. A similar motion was made and denied in the first trial. At the retrial, the court denied the suppression motion, finding that "although Mr. White did in fact invoke his right to an attorney, that he reinitiated questioning with the detective, that he continues to

---

8 At a later hearing, the trial court gave its interpretation of the videotape as White saying, "If that's the case, then what happens from here?"

ask questions of the detective and try [sic] to get information from him, that he does so knowing that he has the right not to speak with him, that he voluntarily continues to speak with him; and that the fact that the detective told him that - he answered no when he was asked I can't talk to my lawyer right now, did not mislead Mr. White to the extent that any subsequent conversation was somehow involuntary or in violation of his rights."

b. Analysis

"'A suspect [in custody], having invoked [Miranda] rights, is not subject to further interrogation by the police until counsel has been made available to him or her, unless the suspect personally "initiates further communication, exchanges, or conversations" with the authorities. [Citations.]'" (People v. Storm (2002) 28 Cal.4th 1007, 1021–1022, citing Edwards v. Arizona (1981) 451 U.S. 477 [68 L.Ed.2d 378].) "'The initiation of further dialogue by the accused, however, does not in itself justify reinterrogation. (Oregon v. Bradshaw (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405].) "[E]ven if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." [Citation.]' [Citation.] Therefore, it is clear that a conversation may be resumed in the absence of counsel only if the 'accused himself initiates further communication, exchanges, or conversations with the police' [citation] and the circumstances indicate that the accused has made a knowing and intelligent waiver of the right to an attorney [citation]." (People v. Bradford (1997) 15 Cal.4th 1229, 1311 [defendant's query as to "what was going on" would not in itself have been sufficient to establish reinitiation of contact, but defendant went further and on his own initiative expressed willingness to speak with the detective after readvisement of Miranda rights].) "[O]nce a suspect in custody invokes his Miranda right to counsel, his or her subsequent statements to police are presumed involuntary and inadmissible if obtained pursuant to an 'encounter [initiated by the police] in the absence of counsel (assuming there has been no break in custody ).' [Citation.]" (Storm, supra, 28 Cal.4th at p. 1023.) The rule barring police recontact after a Miranda request for counsel applies during continuous custody. (Id. at p. 1023.) The rule was designed to protect an accused in police custody from being badgered by police officers in an effort to wear the suspect down after invoking the right to counsel. (Id. at p. 1024.)

Upon review of the trial court's denial of defendant's suppression motion, this court accepts the trial court's resolution of disputed facts and inferences, if supported by substantial evidence, and independently determines from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained. (Storm, supra, 28 Cal.4th at pp. 1022–1023.)

The undisputed facts of what was said in the police interview, as evidenced by the DVD, clearly demonstrate that it was White himself, not the police, who wanted to keep talking after he asked to see a lawyer.  Indeed, the detective repeatedly reminded White that he had asked for a lawyer and had a right to talk with a lawyer and, each time, White pursued further conversation.  The voluntariness of White's actions in resuming the interview is clearly shown in that White, despite his suggestion that he was impaired by drug use, had the presence of mind and sufficient savvy to try to probe the officer for information about what evidence the police had obtained.

We conclude the trial court did not err in denying the suppression motion.

Even assuming for the sake of argument that the trial court erred in denying the suppression motion, any error was harmless beyond a reasonable doubt.  (People v. Cunningham (2001) 25 Cal.4th 926, 994.)  White already made incriminating statements before he asked for a lawyer, e.g., by acknowledging it was his urine in the park bathroom.  Although White did make an additional potentially incriminating statement after asking for a lawyer, it was garbled.  White never admitted involvement in the crime.  His story was that others set him up.

On appeal, White's sole argument about prejudice is that he was prejudiced because the trial court's ruling "inexorably forced [White] to testify in both [trials], subjecting him to unusually prejudicial gang/jail impeachment [evidence]. . . ."  Thus, the prejudice claimed by White was not admission of his statements to the police.  However, White cites nothing in the record proving the trial court's denial of the suppression motion forced him to testify at either trial.  He cites his attorney's hypothetical question during the second trial, "Suppose the Court determined that it was - that it had ruled incorrectly before [by denying the suppression motion in the first trial]?  Right?  And that prompted Mr. White to testify.  Okay?  And if the Court were to rule [in the second trial to exclude White's statements to the police], does that mean that if he doesn't testify this time around, that his testimony at the previous trial would be admissible?"  The judge said she thought not but was unsure and deferred the matter.  When the trial court returned to the matter, White's trial counsel argued that under an objective standard a person in White's position would think the police, by saying he could not have a lawyer at that moment, meant he could not have a lawyer.  White's trial lawyer conceded the issue was moot, since White testified in the first trial, but said, "I'm raising it for appellate processes [sic] because he may not have testified the very first time around had the statement not come in.  [¶]  Right?  Don't answer that.  (Speaking to defendant.)"  The court moved on to other matters.

Thus, counsel did not assert the ruling forced White's trial testimony and indeed stopped White from saying whether or not it did.

> White's reply brief repeats the claim that the ruling was material on his "decision to testify," but again he cites no evidence in the record supporting that claim.
>
> We see no grounds for reversal in the trial court's denial of the suppression motion.

(Opinion at 57-64.)

In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473-74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009). Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469 U.S. 91, 98 (1984). See also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975); DeWeaver, 556 F.3d at 1001.

A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, 560 U.S. 370, ___, 130 S. Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights"). A valid waiver of rights may be implied under the circumstances presented in the particular case. Specifically, "a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v.

Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005)). See also Butler, 441 U.S. at 369-73 (waiver of Miranda rights can be inferred "from the actions and words of the person interrogated.").

The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis. Neder v. United States, 527 U.S. 1, 18 (1999); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002). In reviewing the prejudicial effect of the erroneous admission of testimony, the question is whether the erroneously admitted evidence had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. See also Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000).

Here, the California Court of Appeal reasonably concluded that even if the police violated petitioner's Miranda rights in continuing to question him after he requested counsel, the admission of petitioner's unlawfully obtained statements was harmless. Petitioner asserts that he made several admissions after requesting counsel; to wit, his urine was in the bathroom; he should have "stayed out of all this;" he told "them" not to let it "come back on me;" and that he had a "funk" with Millican. (CT at 1265-69.) Petitioner argues that, "faced with these statements," he had "little choice but to take the stand to defend himself." (Pet. at 106.) Similarly, petitioner argues that the trial court's ruling allowing the admission into evidence of his post-invocation statements was prejudicial because it "inexorably forced [him] to testify in both cases, subjecting him to unusually prejudicial gang/jail impeachment." (Id. at 105.) However, as noted by the California Court of Appeal, there is no evidence in the record, aside from petitioner's claims in court briefs, supporting the notion that he was compelled to testify because the statements he made to the police were deemed admissible, or that he would have decided not to testify if he hadn't made the admissions.

In light of the entire record, which includes petitioner's other incriminating statements and the substantial damaging evidence against him, the fact that his post-invocation statements were somewhat imprecise and ambiguous, and the fact that he did not confess to any involvement in the crime when talking to the police, the state court reasonably determined that petitioner's

statements after he requested counsel, even if erroneously admitted, did not have a "substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 619; Cunningham v. Wong, 704 F.3d 1143, 1165 (9th Cir. 2013) ("In light of the entire record and the other damaging evidence against him, the court reasonably determined that Cunningham's statement, even if erroneously admitted, was harmless"). Accordingly, petitioner is not entitled to federal habeas relief on this claim.

D. Jury Instruction Error

Petitioner also raises three claims of jury instruction error. After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

1. Applicable Legal Principles

In general, a challenge to jury instructions does not state a federal constitutional claim. McGuire, 502 U.S. at 72; Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" Prantil v. State of Cal., 843 F.2d 314, 317 (9th Cir. 1988) (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

2. Accomplice Instruction

Petitioner's jury was given an instruction which stated that the testimony of an accomplice should be viewed with caution and must be corroborated by someone other than another

accomplice.  (CT at 1564.)  That jury instruction further stated:  "If the crime of murder or manslaughter was committed, then Robert Montoya was an accomplice to those crimes."  (Id.) Petitioner claims that the trial court violated his right to due process in failing to also name in the instruction Campaz as an accomplice.  (Pet. at 108.)  He argues that the prosecution elicited "significant inculpatory statements" from Campaz at trial, and he contends that the jury should have been instructed to view those statements with caution.  (Id.)  Petitioner articulates his federal constitutional claim as follows:  "Finally, because [petitioner's] conviction in a close retrial may well have rested on untested, blame-shifting statements of an accomplice, the failure to caution the jury to evaluate accomplice testimony with suspicion, and that corroboration was required, undermined the reliability of the jury's verdicts and findings."  (Id. at 111.)

The California Court of Appeal rejected these arguments largely on state law grounds, reasoning as follows:

> White argues the trial court erred in failing to include Campaz as an accomplice in the jury instruction to view with caution an accomplice's testimony; the instruction mentioned only Montoya as an accomplice.  White does not show he requested such instruction but argues the court had a sua sponte duty.  We see no grounds for reversal.
>
> An accomplice is someone who is "liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (§ 1111.) Although Campaz did not testify, "testimony" in section 1111 includes "all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances," e.g., when the accomplice has been arrested or is questioned by the police.  (People v. Brown (2003) 31 Cal.4th 518, 555.)  Thus, where an accomplice's statement is admitted at trial under a hearsay exception, the trial court should instruct the jury that the accomplice's testimony must be viewed with caution and must be corroborated even though the accomplice does not take the stand.   (Ibid.)   The rationale for instructing the jury to view accomplice testimony with caution is the accomplice's self-interest in shifting blame to the defendant.  (People v. Cook (2006) 39 Cal.4th 566, 601.)
>
> White observes there was evidence of statements by Campaz minimizing Campaz's involvement and maximizing White's involvement.  The People respond that, in the retrial, it was the defense, not the prosecution, which first introduced Ceragioli's testimony that at one point Campaz said he stabbed the victim.  The People were entitled to elicit evidence of other statements by Campaz implicating White.

> Even assuming error for the sake of argument, it was harmless because there is no reasonable probability that White would have received a more favorable result had the trial court instructed the jury to view Campaz's statements with distrust. (People v. Lewis (2001) 26 Cal.4th 334, 371.) Thus, although White denied involvement in the killing, he admitted he was at the scene of the crime (he urinated in the restroom) and that he was angry and frustrated with the victim over borrowing the pickup and money owed for drugs. Even disregarding Chacon's assertedly conflicted statements about whether White admitted "killing" anyone, Chacon testified White asked him for a ride to the river that morning; White was distraught and repeatedly said, "I fucked up" and "we fucked up." At that time he would not explain but said it involved someone who owed him money and raped a girl. Marie Ceragioli testified to statements White made directly to her over the course of time as she performed construction work at his home after the killing, e.g., White told her he made a tape to "cover" himself, and he played for her the audiotape of Anthony Martinez confessing to the crime; White laughed as he played the tape for Ceragioli; White said he "punched" the victim with a spiked knife or weapon; White said he "stepped over the fool [the victim]," who was down on the floor, in order to use the toilet. This evidence amply corroborated accomplice Montoya's testimony that White stabbed the victim.

(Opinion at 79-81.) With respect to petitioner's claim that the jury instruction on accomplices violated his federal right to due process, the California Court of Appeal stated as follows:

> We reject defendant's undeveloped contention that his federal constitutional rights have been violated by a conviction which he believes may have rested on untested, blame-shifting statements of accomplice Campaz.
>
> We conclude there was no prejudicial error in the accomplice instructions.

(Id. at 81-82.)

Respondent argues that the state appellate court's conclusion that petitioner's federal due process claim was "undeveloped" constitutes a procedural bar which precludes this court from addressing the merits of this claim. (ECF No. 17 at 54-55.)

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977). However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim where the default issue turns on difficult questions of state law. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make

sense in some instances to proceed to the merits if the result will be the same"); Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004). Under the circumstances presented here, this court finds that petitioner's jury instruction claim can be resolved more easily by addressing it on the merits. Accordingly, this court will assume for these purposes that petitioner's claim is not procedurally defaulted.

Petitioner has failed to demonstrate that the trial court's failure to name Campaz in the jury instruction on accomplices rendered his trial fundamentally unfair. As explained by the California Court of Appeal, there was significant evidence introduced at petitioner's trial, apart from any statements made by Campaz, that petitioner was a participant in the murder of Millican. The extensive nature of that evidence precludes a finding that the trial court's failure to name Campaz in the accomplice jury instruction rose to the level of a due process violation. Statements by Campaz were simply cumulative of significant other trial evidence introduced on the issue of petitioner's involvement in the killing. The decision of the California Court of Appeal rejecting this claim is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87. Accordingly, petitioner is not entitled to federal habeas relief on this jury instruction error claim.

3. Flight and Destruction of Evidence

In his next ground for relief, petitioner claims the trial court violated his right to due process by giving jury instructions on flight and destruction of evidence to show consciousness of guilt. (Pet. at 112.) Petitioner argues that "the record discloses insufficient evidence of flight to warrant a rational inference of consciousness of guilt as to the current charges (versus accessory after the fact) based on any 'flight' activity by [petitioner]." (Id.) He contends his departure from the scene of the crime did not constitute "flight." (Id. at 113.) Petitioner also argues the jury instruction given by the trial court with respect to destruction of evidence was "inapplicable, irrational, and unfair as an inference of guilt" because it involved petitioner's admitted actions in disposing of certain items after the killing but said nothing about his actions and state of mind before and during the killing. (Id. at 114-15.) Petitioner claims these two jury instructions given

in his case reduced or eliminated the prosecution's burden of proving the elements of the offense beyond a reasonable doubt and violated his Sixth Amendment right to have a jury, and not a judge, "reach the requisite finding of guilty." (Id. at 117.)

The California Court of Appeal rejected these arguments, reasoning as follows:

> White says the trial court erred in instructing the jury on flight (CALCRIM 372[9]) and destruction of evidence (CALCRIM 371[10]) as evidence of consciousness of guilt. We shall conclude there was no error.
>
> As to flight, mere departure from a crime scene does not constitute flight; there must be a purpose to avoid being observed or arrested. (People v. Bonilla (2007) 41 Cal.4th 313, 328.) Here, there was evidence of a purpose to avoid being observed or arrested. Thus, White, Campaz and Montoya left the park in White's blue truck, intending to drop off Campaz at the red truck. They stopped at the red truck, and Montoya opened the door, but upon seeing a police patrol unit, Montoya shut the door, and all three men rode away in the blue pickup.
>
> White argues his conduct said nothing about degree of guilt, i.e., whether it reflected awareness of having committed a crime versus assistance as an accessory after the fact. However, White cites no authority that this distinction makes a difference. The lesson from White's cited cases is that the flight instruction may be inappropriate if the defendant may have fled because of guilt in having committed a different offense, unrelated to the offense which is the subject of the current prosecution. (E.g., People v. Williams (1988) 44 Cal.3d 1127, 1143, fn. 9 [flight must support inference of consciousness of guilt of the crime charged]; United States v. Myers (5th Cir.1977) 550 F.2d 1036, 1049.) Here, there was no evidence of a different offense as a reason for flight.
>
> There was no error in giving the flight instruction.

---

9 The jury was instructed, "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

10 The jury was instructed, "If the defendant tried to conceal or destroy evidence or create false evidence that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If someone other than the defendant tried to discourage someone from testifying or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

> As to instruction regarding destruction of evidence, the instruction is proper if there is some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference that the destruction of evidence may indicate a consciousness of guilt. (People v. Hart (1999) 20 Cal.4th 546, 620.) White says in his appellate brief that he "conceded driving his friends away and helping them destroy evidence." His contention is that he may have been helping merely as an accessory after the fact. However, this was a matter for closing argument; it does not render the instruction improper.
>
> We conclude the trial court did not err in instructing the jury on flight and destruction of evidence.

(Opinion at 82-84.)

The conclusion of the California Court of Appeal that the instructions given to petitioner's jury regarding flight and destruction of evidence were correct under California law is binding on this court. See Bradshaw, 546 U.S. at 76 ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Of course, any claim that the California Court of Appeal misapplied state law is not cognizable in this federal habeas action. Estelle, 502 U.S. at 68.

With regard to petitioner's federal due process claim, he has failed to demonstrate that the giving of the challenged jury instructions rendered his trial fundamentally unfair. For the reasons set forth by the California Court of Appeal, the trial evidence was sufficient to support the giving of jury instructions on both flight and destruction of evidence. The language of those instructions was not unfair or unduly prejudicial. Accordingly, petitioner is not entitled to federal habeas relief with respect to these jury instruction error claims.

4. Voluntary Intoxication

Petitioner's jury was also given the following instruction on voluntary intoxication:

> If you find that the defendant was intoxicated at the time of the alleged crime, you may consider that evidence in a limited way. You may consider that evidence only in deciding the following:
>
> > Whether the defendant acted with the intent required for murder, voluntary manslaughter, lying in wait, aiding and abetting and/or conspiracy.
> >
> > Whether the defendant acted with the state of mind required for murder, voluntary manslaughter, lying in wait, aiding

> and abetting, conspiracy or the natural and probable consequence doctrine.
>
> The previous instructions I have given you for these offenses define the intent and/or state of mind required.
>
> You may not consider evidence of voluntary intoxication for any other purpose.

(CT at 904.)

Petitioner claims this voluntary intoxication jury instruction was "prejudicially inadequate" because the instruction said that jurors "may" rather than "must" consider the evidence regarding intoxication. (Pet. at 118.) He argues that the error in giving this instruction was prejudicial because intoxication was "probably a stronger explanation for the killing" than any other possible motive, and the jurors should therefore have been instructed they must consider any evidence of intoxication. (Id.)

The California Court of Appeal rejected these arguments on the grounds that petitioner failed to "cite any evidence that his intoxication at the time of the offense actually negated a required intent or state of mind." (Opinion at 84.)

Petitioner has failed to demonstrate that the jury instructions, taken as a whole and in context, violated his right to due process. There is no indication that the jury at his retrial applied any of the instructions in an unconstitutional manner. Moreover, as noted, it is presumed that the jury understood and followed the instructions as given. Fields, 503 F.3d at 782. Petitioner's assertion that the jury may have misapplied or ignored the instruction on voluntary intoxication is purely speculative and does not demonstrate his entitlement to federal habeas relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). Accordingly, petitioner is not entitled to relief with respect to this jury instruction error claim.

E. Cumulative Error

Petitioner claims that the cumulative effect of the various errors committed at his trial, described in the claims set forth above, violated his right to due process and a fair trial. (Pet. at 32.) The California Court of Appeal rejected this argument, stating:

/////

> White claims the cumulative effect of the foregoing errors was to deprive him of due process and a fair trial by an impartial jury. We have reviewed the assignments of error and disagree.

(Opinion at 84.)

The Ninth Circuit has concluded that under clearly established federal law, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)). See also Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of constitutional magnitude occurred at trial, "no cumulative prejudice is possible"). "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 623).

Above, this court has addressed each of petitioner's claims individually and has concluded that no error of constitutional magnitude occurred at his trial in state court. This court also concludes that the errors alleged by petitioner, even when considered together, did not render his defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." Parle, 505 F.3d at 927. Accordingly, petitioner is not entitled to federal habeas relief on his claim of cumulative error.

F. Denial of Juror Identifying Information

In his final ground for relief, petitioner claims that the trial court violated his right to due process in denying his request for juror identification information, made after he learned that some of his jurors may have failed to disclose "their own bad intimate experiences with drug users." (Pet. at 121.) He contends that "bad intimate experiences with drug users can give rise to visceral distrust of people like [petitioner] at the time of these offenses – feelings of distrust several jurors apparently discussed during deliberations." (Id. at 125.) Petitioner argues that the trial court's ruling, which was issued "without a hearing or even a follow-up questionnaire or

letter," deprived him of the effective assistance of counsel in developing a "new trial/fair trial claim," as well as of his constitutional rights to due process and "a fair trial by 12 impartial jurors." (Id. at 121, 124.)

The California Court of Appeal rejected these arguments, reasoning as follows:

> 11. Juror Identifying Information
>
> Many modern criminal jury trials now have two phases. In the first phase, the jury determines whether the defendant is guilty. If the jury finds the defendant guilty, the second phase of trial commences: the trial of the jury.
>
> Thus, White argues the trial court denied him due process by denying, without a hearing, his request under Code of Civil Procedure sections 206[11] and 237[12], for disclosure of personal juror identifying information. We see no basis for reversal.
>
> a. Background
>
> After the verdict in the retrial, White filed a petition for access to jurors' personal identification information in order to determine if one or more jurors deliberately failed to disclose in their juror questionnaires information about their knowledge about drugs. White's counsel attested that after the verdict, he was contacted by two jurors who said the issue of drug use came up during deliberations and "for the first time a number of jurors disclosed that they had close friends or relatives who were drug users." The petition submitted a declaration from Juror No. 10 (the jury

[11] Code of Civil Procedure section 206, subdivision (g), states, "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. The court shall consider all requests for personal juror identifying information pursuant to Section 237."

[12] Code of Civil Procedure section 237 calls for the trial court to seal the record of personal juror identifying information upon the recording of a jury verdict in a criminal case, but the statute provides in subdivision (b), "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons, and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."

> foreperson) attesting (1) her mother was a drug addict and alcoholic, but they have no contact with each other; (2) her sister was a drug addict who died while pregnant, perhaps because of an overdose; (3) she did not disclose this information before she was sworn in as a juror; and (4) Juror No. 9 said her brother was a drug addict and coincidentally ran into him outside the courthouse during the time the jury was deliberating.
>
> The petition also submitted an unsigned declaration in the name of Juror No. 9, with attestation by White's attorney that he confirmed the contents with her over the phone, and she also said other jurors made statements about relatives' drug use which was not disclosed in voir dire.
>
> The People opposed the petition, arguing White failed to make the necessary prima facie showing. The People submitted a declaration from Juror No. 10 (the second declaration) saying she met with White's trial counsel at his request; she and Juror No. 9 (who felt bad for White) had become friends; she (Juror No. 10) did not lie on her questionnaire; she did not mention her mother or sister in the questionnaire because it asked about people she was "close to";[13] her mother abandoned her at age one and they had no interaction since then, except the mother made one phone call in the 1990's but the juror hung up; and the juror was separated from her sister by age 5 and had no contact until the sister's death. The juror's information about the drug problems came from second hand sources rather than personal knowledge. Juror No. 10's declaration also said she tried to add this information to the declaration prepared by the defense because that first declaration took things out of context and was incomplete regarding her relationship with her mother and sister. "Despite my requests, certain information was not added." The defense investigator said the juror could add to the declaration by handwritten notation but she did not want to "mess up" the typed document. The declaration's handwritten reference that the juror was signing of her own "free will" was added at the request of the defense investigator after becoming aware that Juror No. 10 had contacted the prosecution and related that the declaration left out information. The juror attested the prosecutor did not pressure her, nor did she tell White's lawyer that the prosecutor pressured her. The prosecutor told her it was up to her whether or not to sign, but she should assure that anything she signed was accurate, and if her wishes were not being honored, she could contact the trial court. The only pressure the juror felt was from the defense investigator, who was upset that she called the prosecutor. She attested, "I signed the [first] declaration despite the fact that it took things out of context and was incomplete regarding my relationship with mother and sister because I was frustrated and I had told [White's attorney] I would sign the document and I wanted to be true to my word."

[13] In the questionnaire, Juror No. 10 answered "no" to the questions: "Have you or anyone close to you ever had a serious problem with the abuse of drugs?" and "Have you or anyone close to you ever been impacted by someone's use of drugs?"

Juror No. 10's second declaration also said, regarding Juror No. 9, that Juror No. 9 simply said one day that she had seen her brother who was in court for a different case, and there was no discussion about it during deliberations.

Juror No. 10 also submitted a handwritten declaration to the court, understandably asking to be left alone.

The trial court denied the petition to release juror identifying information, stating there was no need for a hearing, and the defense failed to make a prima facie showing.  There was no showing of misconduct in Juror No. 10's questionnaire answers about not being close to drug addicts, because she was not close to her biological mother and sister.

As to the assertion (in the unsigned declaration) that other jurors during deliberations admitted knowing drug users, the court first observed that five of the seated jurors admitted in their questionnaires that they knew drug users.  The court also observed that seating jurors who knew drug addicts did not prejudice the defense but suited its purpose.  "[T]he strategy of the defense in this case in part was to highlight the symptoms of excessive use of methamphetamine, including the lack of trustworthiness of persons or extensive users such as the several key prosecution witnesses in this case.  [¶]  So it appears in this - the posture of the defense case was not so much an attempt to run away from the facts of drug users, or the credibility of drug users, but instead to embrace it was a weakness in the prosecution case."

The trial court also observed that Juror No. 9 did disclose in the questionnaire that her brother was incarcerated for drugs.  The court referred to statements in the unsigned declaration about Jurors No. 6 and No. 8 and said their questionnaires also disclosed knowing drug users.  The record contains only excerpts of the questionnaires, and therefore the failure of the excerpts to bear out the court's finding is not conclusive.

b. Analysis

Criminal defendants have a federal constitutional right to a jury trial free from serious juror misconduct.  (People v. Tuggles (2009) 178 Cal.App.4th 1106, 1152[review den. Feb. 10, 2010]; Smith v. Phillips (1982) 455 U.S. 209 [71 L.Ed.2d 78].)  However, we are unaware of any authority holding that the federal Constitution requires the disclosure of jurors' personal identifying information, even upon a showing of a strong possibility of juror misconduct.  (Tuggles, supra, 178 Cal.App.4th at p. 1153.)  Nevertheless, "where the trial court is presented with a credible prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions about whether misconduct occurred."  (Ibid.)   Thus, although Code of Civil Procedure sections 206 and 237 allow jurors to prevent the release of identifying information to the parties and their attorneys, they do not infringe upon the trial court's inherent power to investigate strong indicia of juror misconduct, including issuance of subpoenas

> compelling reluctant jurors to testify. (Ibid.; People v. Cox (1991) 53 Cal.3d 618, 700.)
>
> Here, there was no strong indicia of juror misconduct, and White failed to make a sufficient showing for release of jurors' personal identifying information. His submission of Juror No. 10's declaration in an attempt to show she committed misconduct fell short when Juror No. 10's supplemental declaration placed things in context.
>
> There was no evidence of misconduct by Juror No. 9, who did disclose in her questionnaire that her "brother is/was a [drug] user and has served time at a facility in Elk Grove." She did not commit misconduct by accidentally seeing her brother in the courthouse or by mentioning to Juror No. 10 that he was a drug addict.
>
> As to Juror No. 9's unsigned declaration that Jurors No. 6 and No. 8 stated in deliberations that family members were drug addicts, White fails to disprove the trial court's finding that these jurors did disclose this information in their questionnaires. Although the disclosures do not appear on the questionnaire excerpts submitted in connection with the petition, the trial court had access to the entire questionnaires.
>
> As to Juror No. 9's unsigned declaration that "[o]ther jurors disclosed for the first time in deliberations the fact that they had close family members who were addicted to drugs," this statement on its face is outside the scope of Juror No. 9' personal knowledge. While Juror No. 9 may have knowledge whether jurors disclosed something during verbal voir dire, she does not have knowledge of the contents of the other jurors' written questionnaires. Her declaration does not assert that these other jurors made admissions in deliberations to having lied in the questionnaire. Thus, Juror No. 9's unsigned declaration failed to make a prima facie showing requiring an evidentiary hearing.
>
> White argues the trial court erred in concluding Juror No. 9 lacked credibility, without conducting a hearing. However, it is inconceivable to us that trial counsel would think a juror could be competent to attest that another juror omitted information in the questionnaire (unless the other juror made an admission, which was not the case here).
>
> We conclude the trial court did not err or abuse its discretion in denying White's petition for juror identifying information.

(Opinion at 84-92.)

To the extent petitioner before this court is claiming that the trial court erred in applying California law regarding the unsealing of juror information, his claim is not cognizable on federal habeas review. See Duggar v. Adams, 489 U.S. 401, 409 (1989) ("[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States

Constitution"). As noted above, "federal habeas corpus relief does not lie for errors of state law." Estelle, 502 U.S. at 67 (1991). Moreover, the state appellate court's determination that, as a matter of state law, the trial court properly denied petitioner's request for juror identifying information is binding on this court. Bradshaw, 546 U.S. at 76.[14]

In addition, no federal law requires a state court to permit post-trial access to jurors' personal information, even when evidence of jury misconduct exists. See, e.g., Tanner v. United States, 483 U.S. 107, 127 (1987) (a state court's refusal to conduct evidentiary hearing regarding a juror's use of narcotics did not violate defendant's right to fair and impartial jury where other safeguards, such as voir dire and observations of fellow jurors, sufficiently protected the defendant's rights); Grotemeyer v. Hickman, 393 F.3d 871, 881 (9th Cir. 2004) (no constitutional violation where the state court denied further factual development of jury misconduct allegations); Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003) ("Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias [or misconduct] is raised.").[15]

---

[14] Under California law, jurors have "an absolute right to discuss or not to discuss the deliberation or verdict with anyone," and juror identifying information in a criminal case must be sealed upon the recording of a jury's verdict. Ca. Civ. Proc. §§ 206(a), 237(a)(2). A defendant may, however, petition the court for access to juror identifying information "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." Ca. Civ. Proc. § 206(g). The petitioner must make a prima facie showing of good cause for the release of juror information. Ca. Civ. Proc. § 237(b). See also People v. Santos, 147 Cal.App.4th 965, 976–78 (2007).

[15] Here, petitioner has not identified any clearly established federal law holding that he has a constitutional right to obtain juror identifying information or to perform a post-verdict poll of the jury. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). See also Turner v. McEwen, No. ED CV 11-2069 VAP (JCG), 2013 WL 3778845, *4 (C.D. Cal. July 17, 2013) (denying federal habeas relief in response to a similar claim); Logan v. Runnels, No. CIV S-05-0785 GEB CHS, 2011 WL 1441940, *16 -20 (E.D. Cal. Apr. 14, 2011) (same); Kelsaw v. Horel, No. CIV S-08-1612 MCE CHS P, 2010 WL 3634337, *23 -24 (E.D. Cal. Sept. 14, 2010) (same); Novelo v. Yates, No. CV 06-12544-CJC (VBK), 2009 WL 2578925 (C.D. Cal. Aug. 13, 2009) (same); McCart v. Lamarque, No. CIV S-04-0866 FCD EFB P, 2009 WL 891052, **7-11 (E.D. Cal. Mar. 31, 2009) (same).

The California Court of Appeal's finding that petitioner failed to show good cause for the release of juror information is based on a reasonable determination of the facts of this case. In addition, any further post-trial investigation is likely only to have, at most, produced inadmissible evidence in the form of juror testimony regarding the effect of the jurors' relationship with drug addicts on the jury's deliberative process. "[Jurors] may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." United States v. Bagnariol, 665 F.2d 877, 884–85 (9th Cir. 1981). See also Williams v. Price, 343 F.3d 223, 230 (3d Cir. 2003) ("the exclusion of evidence of juror misconduct pursuant to the traditional 'no impeachment' rule is constitutional because of the important purposes that the rule has long been recognized as serving"); Fed.R.Evid. 606(b); Cal. Evid. Code § 1150(a).

For the foregoing reasons, petitioner is not entitled to federal habeas relief with respect to his claim that that the trial court violated his right to due process in denying his request for juror identification information.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing

/////

Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: September 23, 2013

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
White3016.hc